**PEOPLE OF the STATE OF NEW YORK,**
Appellee.

v.

**Milton A. GALAMISON et al., Appellants.**

**Nos. 156–165, Dockets 29166–29175.**

United States Court of Appeals
Second Circuit.

Argued Oct. 2, 1964.

Decided Jan. 26, 1965.

Certiorari Denied April 26, 1965.

See 85 S.Ct. 1342.

Marshall, Circuit Judge, dissented.

William M. Kunstler, New York City, (Kunstler, Kunstler & Kinoy, New York City), and John E. Silverberg, New York City (Carl Rachlin, New York City, on brief), for appellants.

Harvey B. Ehrlich, New York City (Frank D. O'Connor, Dist. Atty., Queens County, New York, Louis J. Lefkowitz, Atty. Gen., State of New York, Mortimer Sattler, Asst. Atty. Gen., of counsel), Frank S. Hogan, Dist. Atty., New York County (Richard H. Kuh, John A. K. Bradley, Asst. Dist. Attys., of counsel), and Isidore Dollinger, Dist. Atty., Bronx County (Irving Anolik, Asst. Dist. Atty., of counsel), for appellee.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

We have here appeals concerning some sixty persons from orders of the District Courts for the Eastern and Southern Districts of New York, remanding to the New York courts criminal proceedings sought to be removed pursuant to 28 U.

S.C. § 1443,[1] a statute which goes back to the Civil Rights Act of 1866, 14 Stat. 27. The appeals are the first to be taken to this court as a result of § 901 of the Civil Rights Act of 1964, Pub.L. 88–352, which limited the general prohibition of review of remand orders "on appeal or otherwise," 28 U.S.C. § 1447(d),[2] by adding a clause "except that an order remanding a case to the State court from which it was removed pursuant to section 1443 of this title shall be reviewable by appeal or otherwise."

■ In the light of the rule, established before the prohibition of direct review, that an order of remand was not a final judgment subject to appeal under what is now 28 U.S.C. § 1291, but could be tested only by mandamus, Chicago & Alton R.R. v. Wiswall, 90 U.S. (23 Wall.) 507, 23 L.Ed. 103 (1875), and the failure of the framers of the Civil Rights Act of 1964 to amend 28 U.S.C. § 1292(a) to add remand orders under 28 U.S.C. § 1443 as a new category of appealable interlocutory orders, it could be argued with some force that review here would lie only through mandamus. If necessary, despite some prior decisions of this court discussed in United States v. O'Connor, 291 F.2d 520, 524 (2 Cir.1961), we would be prepared to treat the instant appeals as petitions for such writs. However, in view of the Congressional pur-

pose as revealed in the legislative history, H.Rep.No. 914, 88th Cong., 2d Sess. (1963); 110 Cong.Rec. 6739 (daily ed. April 6, 1964) (remarks of Senator Dodd), and the cumbersome nature of mandamus, we shall construe the 1964 statute, despite its inartistic drafting in this respect, as sufficiently revealing an intention to authorize appeals from orders of remand under 28 U.S.C. § 1443.

■ Galamison and nearly fifty other appellants were named as defendants in prosecutions in Queens County, New York, for various acts which disrupted highway and subway traffic to the New York World's Fair in order to publicize their grievances over what Galamison's removal petition characterizes as "the denial of equal protection of the laws to Negroes in the City, State and Nation with reference to housing, education, employment, police action and other areas of local and national life too numerous to mention." Two appellants were arrested in Bronx County after passing out leaflets at a public school urging a protest against lack of integration. Eight more were being prosecuted in New York County for staging a sit-in at City Hall in the course of a protest on the same subject. All filed petitions removing the criminal cases against them to the federal courts.[3] The state having moved to remand, Judge Rosling in the Eastern

---

1. "§ 1443. Civil rights cases.

 "Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

 "(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

 "(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law."

2. The prohibition dates from the Act of March 3, 1887, § 1, 24 Stat. 552, as con-

strued in In re Pennsylvania Co., 137 U. S. 451, 11 S.Ct. 141, 34 L.Ed. 738 (1890).

3. For reasons that escape us, the petitions were captioned as proceedings by the various petitioners against the City of New York. A proceeding removed to a federal court remains what it was in the state court, in this instance criminal actions by the State of New York against the defendants. We have revised the caption so as to reflect the true nature of the proceedings.

 The New York statutes alleged to have been violated were Penal Law, McKinney's Consol.Laws, c. 40, §§ 244 (assault third), 722 (disorderly conduct), 722-b (loitering at school building), 1532 (maintaining a nuisance), 1851 (resisting an officer), 1990 (obstructing railway cars), 2036 (unlawful intrusion), and 2092 (unlawful assembly), and Education

District of New York, dealing with the Queens County cases, and Judge Cannella in the Southern District of New York, dealing with the Bronx and New York County cases, granted the motions without conducting the evidentiary hearings which appellants had sought primarily, if not exclusively, with reference to their claims under § 1443(1). Appeals having been taken, judges of this court stayed the remand orders to enable us to consider the important and largely novel questions presented.

At the argument before us, counsel for the appellants expressly disclaimed reliance on the first clause of § 1443, and staked the cases entirely on the second. The district attorneys asked us to disregard informalities in the removal petitions and dispose of appellants' claim under § 1443(2) on the merits—a proposal which appellants applauded. Reading the petitions in the spirit which the State has invited and in the light of appellants' thorough briefs, we construe them as asserting that appellants' acts of protest and resistance were "under color of authority" of one or more of three "law[s] providing for equal rights"— the guarantees of free speech and petition embodied in the due process clause of the Fourteenth Amendment, the equal protection clause of that Amendment, and statutory protection of rights conferred by the Constitution, notably 42 U.S.C. §§ 1981 and 1983.[4] Alternatively the petitions sugest that appellants' refusal to obey police commands was "on the ground that it would be inconsistent with" the same three sets of laws.

We pause at this point for a word concerning our dissenting brother's position that the petitions are so defective that we ought simply to vacate all the orders of remand and have everyone start over again. While the petitions may not have been drawn with the expertness desired and might well have been insufficient properly to raise the question of removal under § 1443(1), there is not and never has been any such difficulty in discerning what is here at issue as the dissent suggests. The Queens County cases concern widely publicized mass demonstrations in public places—the streets and the subway. The New York County cases concern demonstrations in City Hall. No one asserts that Negroes in New York City are subjected to unequal treatment in any of these places or that the demonstrations were intended to remove discrimination there; the protests were directed at alleged unequal treatment generally "in the City, State and Nation." This leaves the cases from Bronx County. We shall assume that the school at which these two appellants were distributing leaflets was in their view a segregated one; on the other hand, there is not a word in the petitions, nor has there been the slightest suggestion from counsel, that the appellants were or had children in that school.

It would indeed be pleasant if we could conscientiously avoid decision here. The interpretative problems are difficult, due to the age of the statute, the lack of decisions thereunder and the mangling which it has undergone; it is unfortunate that, in subjecting remands under § 1443 to review, the draftsmen of the Civil Rights

Law, McKinney's Consol.Laws, c. 16, § 3212 (inducing truancy).

4. "1981. Equal rights under the law.
"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and ex-

actions of every kind, and to no other."
"1983. Civil action for deprivation of rights.
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Act of 1964, understandably preoccupied with more pressing issues, did not attempt to clarify what that venerable statute meant. The pain of decision is exacerbated when one choice may somewhat impair expectations entertained by persons of good will whose objectives we admire, and the other, in our view, would do violence to institutions and relations we hold equally dear, the continued efficient functioning of which has far greater long-run importance to minorities than the special relief here sought. But, as Judge Learned Hand so frequently reminded us, often in more colorful language, it is "a judge's duty to decide, not to debate," The Spirit of Liberty 100 (1959 paperback ed.)—and here to construe, not to suggest a variety of possible constructions without coming to rest on any one. Apart from desiderata as to the instant prosecutions, the district courts in this circuit require guidance as to other cases that have been accumulating while we have had these under advisement. And it will be more helpful to the Supreme Court and to the Congress—and it is well to remember it is a statute we are expounding—for us to expose the problems raised by the removal petitions here before us and state what we consider their proper solution under existing law, rather than postpone the issue by remanding these cases

and having them back six months hence with the issues no different then than now.

We turn initially to the history of the statute. Section 1443 stems from § 3 of the first Civil Rights Act, 14 Stat. 27 (1866), quite obviously enacted under the power conferred by the recently adopted Thirteenth Amendment and prior to the adoption of the Fourteenth. Section 1 of the Act declared that, with exceptions not here relevant, "all persons born in the United States * * * of every race and color, without regard to any previous condition of slavery or involuntary servitude * * * shall have the same right * * * to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other * * * *" Section 2 made it a crime for any person "under color of any law, statute, ordinance, regulation, or custom" to deprive any person of any right secured by the Act. There follows the removal provision, § 3, the first sentence of which we quote in the margin.[5]

---

5. "*And be it further enacted*, That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offences committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever, or against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from

this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof, or for refusing to do any act upon the ground that it would be inconsistent with this act, such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain cases,' approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof."

The provision was rather clearly modeled on § 5 of the Habeas Corpus Act of 1863, 12 Stat. 756, which provided:

"*And be it further enacted*, That if any suit or prosecution, civil or criminal, has been or shall be commenced in any state court against any officer, civil or military, or against any other person, for any arrest or imprisonment made, or

The Act of May 31, 1870, 16 Stat. 140, reenacted the Civil Rights Act of 1866, safeguarded the equal rights of citizens to vote, and defined, among others, the crime of conspiring to injure a citizen in the exercise of rights "granted or secured to him by the Constitution or laws of the United States," now 18 U.S.C. § 241. Although the new act had added a major new statutory right and expanded original federal jurisdiction in several respects, the 1866 removal provision was not broadened significantly. An amendatory Act of Feb. 28, 1871, 16 Stat. 433, created a scheme for supervising federal elections and made certain provisions for removal in voting rights cases.

The first important change of language in the removal section came in the Revised Statutes of 1875 and 1878, the former of which constituted "positive law." [6] In codifying the laws these revisions distributed what had become the considerable bundle of provisions concerning civil rights among four titles. Title XXIV, entitled "Civil Rights," included the former § 1 of the Civil Rights Act of 1866, divided into two sections, 1977 and 1978, which have been carried forward as 42 U.S.C. §§ 1981 and 1982. The civil liability which § 1 of the Act to Enforce the Provisions of the Fourteenth Amendment, 17 Stat. 13 (1871), had created in respect of any person who, under color of any state law, subjected another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States," was broadened to include "the Constitution and laws"; this became § 1979, now 42 U.S.C. § 1983. Title XXVI, The Elective Franchise, comprised all the rights, rules and civil liabilities related to voting.

Criminal provisions concerning civil rights and voting appeared in Chapter 7 of Title LXX, "Crimes." The jurisdictional provisions, both for original jurisdiction and on removal, were placed in Chapter 7 of Title XIII, "The Judiciary." The removal provision, § 3 of the Civil Rights Act, became § 641, reading as follows:

"When any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction of the United States, or against any officer, civil or military, or other person, for any arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid, or for refusing to do any act on the ground that it would be inconsistent with such law, such suit or prosecution may, upon the petition of such defendant, filed in said State court at any time before the trial or final hearing of the cause, stating the facts and verified by oath, be removed, for trial, into the next circuit court to be held in the district where it is pending."

Section 641 was carried forward into § 31 of the Judicial Code of 1911, 36 Stat. 1096, without any real change. In contrast, the 1948 codification greatly altered

---

other trespasses or wrongs done or committed, or any act omitted to be done, at any time during the present rebellion, by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any act of Congress, * * *" then the defendant may, after compliance with certain procedural requirements, remove the action to a federal court.

6. The first edition of the Revised Statutes was authorized in 1866, completed in final form in 1873, enacted in 1874, and published as 18 Statutes at Large (part I) in 1875. See Dwan & Feidler, The Federal Statutes—Their History and Use, 22 Minn.L.Rev. 1008 (1938). Adopting one of several possible usages, we label the first edition as the "Revised Statutes of 1875" and, for simplicity, refer to its compilers as the Revisers of 1875.

the language. Procedural details were split off into other sections; the structure was rearranged by putting the verb "may be removed" before both clauses instead of after both and by separating the clauses with numbers; the words "any officer, civil or military, or other person" in the second clause were dropped, with nothing supplied to replace them; "arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority" was contracted to "any act under color of authority"; and the "as aforesaid." after "any law providing for equal rights" in clause (2) was eliminated. At the same time an important change, obviously of substance and clearly so indicated in the Reviser's Note, was made in the removal provision, § 1442, dealing with federal officers. The corresponding provision in Rev.Stat. § 643, carried forward in § 33 of the 1911 Code, 36 Stat. 1097, had covered civil suits or criminal proceedings against officers or other persons acting under the revenue laws.[7] Section 1442(a) (1) of the 1948 Code expanded this coverage to allow removal by "any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

I. This history assists us in disposing of the State's first argument in support of remand, namely, that the two clauses of § 1443 must be read together and the conditions of both satisfied. The argument derives from the action of the 1948 Reviser in eliminating the venerable words "any officer, civil or military, or other person" and also the "or" which had always separated the two clauses, thus leaving clause (2) without any referent and arguably linking it to clause (1).

But the State's textual argument is overborne by a multitude of other considerations. Until 1948 the two clauses were grammatically parallel and were always separated by an "or"; and the 1948 Congress could not have meant that an officer seeking to avail himself of the second clause, which often would have afforded his sole basis for removal, would also have to meet the tests of the first. An intention on the part of the 1948 Congress to collapse two independent grounds of removal, recognized for three-quarters of a century, into a single one, more limited than either, ought not be assumed unless compelled by the language or supported by legislative history. But there is no such history and the linguistic difficulties in reading the two clauses as alternatives are more grammatical than semantic—it is not really hard to see that Congress was driving at two things rather than at one; indeed, the difficulties in such a reading are rather less formidable than those entailed in an attempt to read the second clause as limiting the first. The general scheme of the jurisdiction sections of the Judicial Code is that numbered clauses are alternatives, see, e.g., §§ 1332(a), 1333, 1343, 1442(a). We treat the omission of a referent in § 1443(2) as an unwise attempt by the Reviser to achieve compactness; what referent should be supplied is a different question, discussed in Section III below.

II. We deal next with the State's argument that appellants' acts went beyond the proper bounds of the freedom of speech and petition that the Constitution guarantees. The short answer, when the argument is stated in this breadth, is that these are the very questions which, under appellants' construction of § 1443(2), Congress meant to have decided in a federal trial; a defendant seeking removal under that section does not have to prove preliminarily that

---

7. The emphasis on revenue officers goes back to statutes enacted to meet New England's resistance to the War of 1812, Act of Feb. 14, 1815, § 8, 3 Stat. 198, and South Carolina's resistance to the tariff, Act of March 2, 1833, § 3, 4 Stat.

633. Section 643 also covered other possibilities, notably officers and other persons acting under Title XXVI, the elective franchise—a provision omitted in 1911.

he will prevail. It is true that a particular case might go so far beyond any possible scope of the right relied on as to transcend the most expansive reading of § 1443(2); it could not be seriously contended, for example, that assaulting a state official for delay on his part in achieving integration was protected by any provision of the Constitution. But the State has not shown that the appellants here fail on this ground.

III. We thus reach a more serious contention, namely, that § 1443(2) covers only officers and those persons assisting them or acting in some way on behalf of government. To say that clause (2) contains no description of who may invoke it is not a sufficient answer; some referent must be supplied.

Appellants say that the original language of the Civil Rights Act, allowing "any officer * * * or other person" to remove, must also have permitted removal by persons not acting officially, that is, persons merely exercising certain civil rights. This juxtaposition of "officer" and "other person" was carried forward into every revision from Rev. Stat. § 641 onwards until 1948, and the 1948 revision surely did not mean to narrow removal. But, although ejusdem generis, relied on by the State to limit "or other person" to a quasi-official, is a dubious aid, see the opposing instances in Llewellyn, The Common Law Tradition: Deciding Appeals 526–27 (1960), there are extremely substantial arguments in support of the State's construction.

One begins with the troubling question why if "other person" in fact meant "any person," Congress did not simply repeat in the second or "authority" clause of § 3 of the Act of 1866 and § 641 of the Revised Statutes, these words which it had already used in the first or "denial" clause. Next, since the first clause was directed only toward freedmen's rights, symmetry would suggest that the second clause concerned only acts of enforcement. "Arrest or imprisonment, trespasses, or wrongs," were precisely the probable charges against enforcement officers and those assisting them; and a statute speaking of such acts "done or committed by virtue of or under color of authority derived from" specified laws reads far more readily on persons engaged in some sort of enforcement than on those whose rights were being enforced, as to whom words like "acts founded upon" would have been much more appropriate. The inclusion of "or other person" can readily be explained without going so far as appellants urge. In anticipation of massive local resistance Congress devoted §§ 4–10 of the Civil Rights Act of 1866 to provisions compelling and facilitating the arrest and prosecution of violators of § 2, the criminal sanction for § 1 rights. These sections authorized and required district attorneys to prosecute under § 2, fined marshals who declined to serve warrants, authorized federal commissioners to "appoint, in writing * * * any one or more suitable persons, from time to time" to serve warrants, empowered the persons so appointed "to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the * * * forces of the United States" as was needed, and made interference with warrant service a further federal crime. Although the "one or more suitable persons" might be deemed "officers," the bystanders and the posse comitatus were not, and were surely among those covered by "other person." The argument for a limited construction of "other person" in the "authority" clause is aided by the consideration that the 1866 Act conferred original jurisdiction only for the "denial" category. The freedmen would need that resource, whereas officers and persons acting under or in aid of them normally would not. Finally, the derivation of § 3 of the 1866 Act from § 5 of the Habeas Corpus Act of 1863, see fn. 5, argues against appellants' broad construction. The "any other person" in the 1863 act was someone who had been deputized by the President or by Congress to do something, not a person asserting his own rights. It is rather logical to assume that Congress had the same kind of "person" in mind when it used the same phrase in

the Civil Rights Act of 1866 and repeated it in § 641 of the Revised Statutes.

Appellants' counterargument as to the meaning of the Reconstruction legislation rests largely on the basis that when Congress wanted to limit a removal provision to officers and persons acting under or in aid of them, it knew how to say so. The first such act, 3 Stat. 198 (1815), had referred to "any collector, naval officer, surveyor, inspector, or any other officer, civil or military, or any other person aiding or assisting, agreeable to the provisions of this act, or under colour thereof, for any thing done, or omitted to be done, as an officer of the customs, or for any thing done by virtue of this act or under colour thereof * * * " [8] And the very Congress that adopted the Civil Rights Act of 1866 provided for removal of any civil or criminal action "against any officer of the United States, appointed under or acting by authority of [certain prior revenue acts] * * * or against any person acting under or by authority of any such officer on account of any act done under color of his office, or against any person holding property or estate by title derived from any such officer, concerning such property or estate, and affecting the validity of [the revenue laws] * * * " 14 Stat. 171.

Moreover, appellants contend that even if the State were right as to the meaning of the Reconstruction legislation, a broadening change was effected in 1948 since, the Reviser's surgery having left clause (2) without a referent, the "any person" of clause (1) is a readier source than the words in predecessor statutes. This argument gains support from the condensation of the historic "for any arrest or imprisonment or other trespasses or wrongs, made or committed by virtue of or under color of authority derived from any law providing for equal rights as aforesaid," language rather strongly suggesting enforcement activity, into the more neutral "for any act under color of authority derived from any law providing for equal rights." Force is added by the simultaneous broadening of § 1442(a) (2) dealing with federal officers, which we have outlined above, a change which makes § 1443(2) largely redundant if it is confined to officers and persons acting under them.

Against this is the point that the 1948 Reviser gave no indication that § 1443 was being substantively changed; the Note to the section spoke only of changes in phraseology, and a Congress preoccupied with other matters doubtless took him at his word. The courts have had frequent occasion to become familiar with the penchant of the 1948 Reviser for making a "quite unnecessary change in phraseology, apparently motivated in part by a stylistic preference," Gilmore & Black, The Law of Admiralty 35 (1957), without adequately considering the consequences arguably incident to the alteration and consequently without informing Congress of its possible effect. In the case of the "saving to suitors" clause, 28 U.S.C. § 1333(1), discussed in the cited text, the Supreme Court found that the words of 1789 were a better guide to current Congressional purpose than those of 1948. Madruga v. Superior Court, 346 U.S. 556, 560 & n. 12, 74 S.Ct. 298, 98 L.Ed. 290 (1954). And in Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 227, 77 S.Ct. 787, 790, 1 L.Ed.2d 786 (1957), the Court gave effect to "statements made by several of the persons having importantly to do with the 1948 revision * * * that no changes of law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed."

While it has seemed worthwhile to set forth these arguments and counterarguments in detail, we find it unnecessary in this case to decide between them. For the appeals fail on other grounds although these are not unrelated to the point just discussed.

---

8. On the other hand, the Act of March 2, 1833, § 3, 4 Stat. 633, used "or other person" without any qualification, and it is hard to believe that this act contemplated broader removal.

IV. We next consider whether appellants' claims under the equal protection clause of the Fourteenth Amendment and its statutory precursor, 42 U.S.C. § 1981, meet the "color of authority" or inconsistency requirements of § 1443(2).

We begin by returning to the text we must construe. We have agreed with appellants that § 1443(2) affords a ground for removal separate from § 1443 (1), and we are henceforth assuming, *arguendo*, that § 1443(2) is not limited to officers or persons acting at their instance or on their behalf. It is undisputed, as the textual history demonstrates, that the laws referred to in the two clauses are the same, despite the more abbreviated language of the second. Yet a person relying on "a right under any law providing for the equal civil rights of citizens of the United States" may remove only if he "is denied or cannot enforce" that right in the state courts, whereas a person whose act is "under color of authority derived from" such a law may remove without any such limitation. It necessarily follows that "under color of authority derived from" in § 1443(2) has a narrower meaning than "a right under" in § 1443(1), since otherwise, in almost all cases covered by the first clause, which clearly covers deprivations of substantive rights and not merely procedural inequalities, the requirement of showing denial or inability to enforce would be avoided by resort to the second.

■■ We gain a valuable insight into the meaning of "color of authority" if we reflect on the cases at which § 1443 (2) was primarily aimed and to which it indubitably applies—acts of officers or quasi-officers. The officer granted removal under § 3 of the Civil Rights Act of 1866 and its predecessor, § 5 of the Habeas Corpus Act of 1863, would not have been relying on a general constitutional guarantee but on a specific statute or order telling him to act. Cf. Hodgson v. Millward, 12 Fed.Cas. No. 6,568 (C.C. Pa.1863), approved in Braun v. Sauerwein, 77 U.S. (10 Wall.) 218, 224, 19 L.Ed. 895 (1869).[9] A private person claiming the benefit of § 1443(2) can stand no better; he must point to some law that directs or encourages him to act in a certain manner, not merely to a generalized constitutional provision that will give him a defense or to an equally general statute that may impose civil or criminal liability on persons interfering with him.

Unwillingness to recognize this lies at the basis of our brother's dissent. It may be true enough that in common usage and understanding a person would be thought to have "color of authority" —although this is not exactly the ordinary discourse of laymen—to do any act which he can successfully defend or for interference with which he can recover damages or ask the government to prosecute. But the issue is not the usage and understanding of ordinary words but the meaning of technical words in the particular context in which Congress used them in the two clauses of § 3 of the Civil Rights Act of 1866 as this has been carried forward into 28 U.S.C. § 1443. "If the history of the interpretation of judiciary legislation teaches anything, it teaches the duty to reject treating such statutes as a wooden set of self-sufficient words * * *" Romero v. International Terminal Operating Co., 358 U.S. 354, 379 (1959). A Court much closer to the Reconstruction legislation than we are, Bigelow v. Forrest, 76 U.S. (9 Wall.) 339, 348–349, 19 L.Ed. 696, 79 S.Ct. 468, 484, 3 L.Ed.2d 368 (1869), applying the removal provision of the Habeas Corpus Act of 1863, see fn. 5, decided squarely that even when there was a specific statute or presidential order, not every act deriving its foundation

---

9. Cunningham v. Neagle, 135 U.S. 1, 10 S. Ct. 658, 34 L.Ed. 55 (1890), cited in the dissent, did not arise under a statute using the phrase "color of authority." However, the specific direction of the Attorney General to Neagle, 135 U.S. at 48, 10 S.Ct. at 663, is a good example of what would clearly constitute "color of authority."

therefrom was "under color of authority" of the statute or order for removal purposes.

■ Our problem as to the equal protection clause and 42 U.S.C. § 1981 is thus not whether these are laws providing for equal rights, as they clearly are, but whether they confer "color of authority," in the sense of § 1443(2), to perform the acts that are the subject of the state prosecution. We find ourselves unable to give an affirmative answer. Although alleged denial of equal protection in schools and other respects afforded the motivation and was the subject of appellants' acts, neither the equal protection clause nor § 1981 confers "color of authority" to perform acts which a state alleges to be in violation of laws of general application intended to preserve the peace from disturbance by anyone. The constitutional provision and the statute are addressed to preventing inequality in the treatment of conduct, and to that great purpose alone. They give no constitutional defense, let alone "authority," for disregard of laws providing for the equal punishment of disturbers of the peace simply because the disturbances were in the course of protests over alleged denial of equality in schools, housing or economic opportunity—any more than the Second Amendment bestows "authority" to disturb the peace in the course of a protest over an alleged denial of the right to keep arms or the Fourth Amendment does so with respect to a protest over police methods. A different case from any here before us would be presented if the act complained of in the state suit was performed in the defendant's exercise of an equal right, such as the right to equal accommodations under § 201 of the Civil Rights Act of 1964, which Congress has singled out for federal protection. In such a case it could be contended that Congress "authorized" self-help to enforce such a specifically granted right,[10] and that the same principle would include a protest by the aggrieved person at a segregated place of accommodation on the theory that the greater includes the less. That would be altogether different from saying that other protests over lack of equal treatment, such as those at issue on these appeals, derive "color of authority" from the equal protection clause or equal rights statutes; the relevant provision here is the First Amendment as incorporated in the due process clause of the Fourteenth, see Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965),

10. In Hamm v. City of Rock Hill, 379 U. S. 306, 311, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964), the majority said that "the language of § 203(c) supports a conclusion that nonforcible attempts to gain admittance to or remain in establishments covered by the Act, are immunized from prosecution, for the statute speaks of exercising * * * a 'right or privilege' secured by its earlier provisions." But the statement of Mr. Justice Black, dissenting: "I do not understand from what the Court says that it interprets those provisions of the Civil Rights Act [of 1964] which give a right to be served without discrimination in an establishment which the Act covers as also authorizing persons who are unlawfully refused service a 'right' to take the law into their own hands by sitting down and occupying the premises for as long as they choose to stay," 379 U.S. 318, 85 S. Ct. 389, creates doubt whether the majority's statement goes as far as the instant dissent implies.

Considerations similar to those stated in the text with respect to public accommodations, dealt with in Title II of the Civil Rights Act of 1964, might apply to the cases, put in the dissent, of a Negro who used self-help to register at a state university or who picketed in protest over a refusal, since, as our brother persuasively argues, Congress would have included an affirmation respecting public education in Title IV similar to that in § 201(a) as to public accommodations if it had considered this necessary. But even if such cases should ultimately be held within § 1443(2)—an issue on which we express no opinion, such a construction would not go beyond protests by those, or parents of those, attending or seeking to attend the particular school where the protest took place. None of the petitions here save the two Bronx County cases concerned protests at a school, and there is nothing to suggest that either of these persons was a child or the parent of a child at that school.

and we will later discuss appellants' claims in that regard. Similarly, submission to the orders of law officers to desist from conduct forbidden by general state penal laws is not "inconsistent" with the equal protection clause or with § 1981 simply because the conduct was a protest over lack of equal protection; neither the constitutional provision nor the statute directs anyone to resist.[11]

Appellants do not urge that New York has administered its penal laws in a discriminatory manner, so that conduct which the statutes forbid on their face would nevertheless be tolerated if carried on by a different group or for a different cause, see Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Fowler v. State of Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), and they have made no suggestion that they wished to or properly could amend the petitions to assert this. Even if this had been plausibly asserted, it would still do some violence to the structure of § 1443, as we have analyzed this, to say that the equal protection clause or 42 U.S.C. § 1981 gives "color of authority" to perform an act, forbidden by nondiscriminatory legislation, which the state can constitutionally punish if only it punishes all persons doing acts of the same kind, and thus afford basis for removal under § 1443(2) without the necessity of alleging denial or inability to enforce rights under these laws in the state courts, as would be required under § 1443(1). Whatever the ultimate resolution of such questions may be, they are not before us on these appeals.

It is wholly consistent with the scheme of the removal statute to say that generalized guarantees of equal rights do not afford color of authority under the second clause of § 1443. Such guarantees are within the first clause; even if the second clause should be held to include private citizens, it was drawn with primary reference to officers and persons acting at their instance; and we see no basis for the dissent's suggestion that our construction would frequently make it unavailable even to them.

■ V. Appellants' contentions based on statutes such as 42 U.S.C. §§ 1983 and 1985 and 18 U.S.C. §§ 241–242, creating civil claims or imposing criminal penalties for deprivation of constitutional rights, are unfounded for two reasons. As will be explained in section VI of this opinion, we do not believe that such statutes, coextensive with the whole reach of the Constitution, are laws providing for *equal* rights to which alone § 1443 is addressed. And, as already shown, in order for a statute to provide "color of authority" to perform an act in the special context of § 1443(2), it must do more than protect conduct by giving remedies to the offended party. In that sense, all that is "authorized" by the statutes here under discussion is the award of damages or of criminal punishment. And it is in no way "inconsistent" with them for the victim to suffer the deprivation and then bring a civil suit or request the bringing of a criminal prosecution—the very purpose for which the statutes were designed.

■ VI. We thus turn to appellants' claims based on the prohibition, in the due process clause of the Fourteenth Amendment, of deprivation of "liberty," including the freedom of speech and petition guaranteed by the First Amendment. We hold that quite apart from the question of "color of authority," which would also require resolution in this context, the claims fail on the ground that these basic guarantees are not laws

11. History makes plain that the "refusal" language had a very limited purpose. The reason assigned for insertion in the 1866 Act was that it was "to enable State officers, who shall refuse to enforce State laws discriminating in reference to these rights on account of race or color, to remove their cases to the United States courts when prosecuted for refusing to enforce those laws." Cong. Globe, 39th Cong., 1st Sess. 1366 (1866).

providing for "equal" civil rights to which § 1443 is confined.

It is clear that rights of this sort were not in the contemplation of the framers of § 3 of the Civil Rights Act of 1866. In that act, adopted prior to ratification of the Fourteenth Amendment, what has become § 1443(2) permitted removal only "for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act" and the Freedmen's Bureau Acts. None of these statutes has any provision remotely relating to the general protection of freedom of speech or petition against state infringement, and there would hardly have been constitutional basis for so providing. After the ratification of the Fourteenth Amendment, Congress left the cross-reference unchanged until the passage of the Revised Statutes of 1875, and it added no additional removal provisions here significant in the interval.[12] But the Revised Statutes altered the cross-reference to "any law providing for equal [civil] rights." The issue posed is whether it was thereby intended that a claim that an act, challenged by a civil suit or criminal prosecution in a state court as a disturbance of the peace, was protected by the constitutional guarantee of liberty, would satisfy the requirement of showing that the act was "made or committed by virtue of or under color of authority derived from" a "law providing for equal [civil] rights," or that a similar claim with respect to any refusal to act so challenged was "on the ground that it would be inconsistent with such law."[13]

It would be strange if what was represented to be a mere codification accomplished so great a substantive change. The issue is not whether the Reconstruction Congress would have been capable of so drastic an alteration in judicial jurisdiction. The point rather is that it would be a flight of fancy to attribute, on the basis of a readily explicable change in wording, such an undisclosed purpose to a Congress which was aiming only to "revise, simplify, codify, arrange, and consolidate" existing statutes, and was so intent on avoiding substantive alterations that it designated a lawyer for the purpose of eradicating any such changes made by the codifying commis-

---

12. We do not consider that the reference in the Act of April 20, 1871, § 1, 17 Stat. 13, the antecedent of 42 U.S.C. § 1983, authorizing "such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts," under the provisions of the Civil Rights Act of 1866, "and the other remedial laws of the United States which are in their nature applicable in such cases," had the effect of making applicable the removal provisions of the 1866 act. "Such proceeding" is the private cause of action created by the 1871 act, and the cross-reference was rather to the portions of § 3 dealing with original jurisdiction in civil causes and to § 10 of the 1866 act. When Congress wished to expand the removal provisions, it used much more explicit language, as in the Act of Feb. 28, 1871, § 16, 16 Stat. 438.

13. Apology for examination of this issue is scarcely needed; the dissent's reference to Mr. Justice Frankfurter's witty reference in Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 100 L. Ed. 412 (1956), is misplaced. We are not at all seeking to overcome clear statutory language by resort to legislative materials. If the words are read in their "ordinary" meaning, they are limited to laws stated in terms of equality, both because that is what they say and because "equal" would otherwise be redundant. We examine the history to determine whether Congress meant something more than it said, and conclude it did not. It is passing strange to find Mr. Justice Frankfurter, very likely the strongest advocate of a historical approach to statutory construction ever to sit on the Supreme Court, see, e.g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 186, 61 S.Ct. 845, 85 L.Ed. 1271 (1943); United States v. Monia, 317 U. S. 424, 432, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (dissenting opinion); Monroe v. Pape, 365 U.S. 167, 211–246, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (dissenting opinion), cited as opposing this.

sion.[14] The need for the 1875 Revisers' altering the cross-reference in § 3 of the Act of 1866 arose, as has been explained, from the very fact of codification and the consequent separation of the removal provisions from the rights and authorizations to which they referred. It is far more reasonable to conclude that the Revisers were thinking of laws stated in egalitarian terms, notably those that had been § 1 of the Civil Rights Act and had become Rev.Stat. §§ 1977–1978, now 42 U.S.C. §§ 1981–1982, which is what they said, than that they meant to extend the right of removal to any person claiming the "liberty" protected by the newly adopted amendment, whose effect in that respect was, to say the least, then uncertain.

This view that no significant change with respect to removal was intended is confirmed by the Revisers' choice of the phrase best suited to convey the thought that only rights like those originally defined in § 1 of the Civil Rights Act of 1866 were to continue to constitute a basis therefor—"any law providing for equal rights." The rights protected by § 1 of the Civil Rights Act of 1866 were not absolutes but relatives; they were rights to equality—the limit of Congressional power when the legislation had to be rested solely on the Thirteenth Amendment. Appellants say that since the rights of freedom of speech and of petition are guaranteed to all and not just to some, they also are "equal" civil rights. But this truism, which is the strength of the argument, is also its weakness. What is so obvious to appellants must have been just as obvious to Congress, and "equal" would thus have been surplusage. That the Reconstruction Congress knew how to speak more broadly is evidenced by § 1 of the Act of April 20, 1871, 17 Stat. 13, later Rev.Stat. § 1979, and now 42 U.S.C. § 1983, referring to the deprivation of "any rights, privileges, or immunities" and particularly by Rev.Stat. § 629 Six-

teenth, now 28 U.S.C. § 1343(3), giving the circuit courts original jurisdiction of suits for the deprivation under color of state authority "of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States." Congress thus recognized the existence of a special body of laws providing for *equal* rights distinguishable from the universal protections of the Constitution. It was these *equal* rights laws, which had been referred to in the removal section as enacted in 1866 and were carried forward into the Revised Statutes, that furnished a basis for removal.

■ If there is thus no reason for thinking that Congress intended any significant substantive change in the cross-reference of the removal statute when it made the revision of 1875, there is equally little reason for believing that it had that purpose in the revisions of 1911 or of 1948. Because of the Supreme Court's restrictive interpretation of what is now § 1443(1), see infra, and the prohibition of appellate review of orders of remand, the civil rights removal statute had been little used, and nothing suggests that the 1911 and 1948 Congresses were in any way concerned about this. We do not wish to be misunderstood as saying that the cross-reference today covers only those equal rights laws that existed in 1866. As Congress enacts new laws relating to equal rights, the cross-reference in § 1443 takes them in; unquestionably the Civil Rights Act of 1964 is a law providing for equal rights within the removal statute. But that is very different from saying that every civil right conferred on all is so included.

On this point we receive also the welcome aid of authority. One of the claims in Gibson v. State of Mississippi, 162 U.S. 565, 586, 16 S.Ct. 904, 908, 40 L.Ed. 1075 (1896), where removal had been

---

14. See Act of June 27, 1866, 14 Stat. 74; Dwan and Feidler, supra note 6, 1013–14. It is said that the final revision passed the Senate in 40 minutes. See id. at 1015 n. 38.

sought under the "denial" clause, was "that the statute under which the grand jury was organized was *ex post facto*, when applied to the case of the present defendant * * *" The first Mr. Justice Harlan remarked, "This question does not depend upon section 641 of the Revised Statutes, but upon the clause of the Constitution forbidding a State to pass an *ex post facto* law," so that the claim was relevant only to the correctness of the state court judgment and not to that of the order of remand. Yet the right of protection against an *ex post facto* law is surely a civil right secured by the Constitution and, on appellants' theory, an "equal" civil right which was being denied by the state. Similarly, Steele v. Superior Court of California, 164 F.2d 781, 782 (9 Cir. 1947), cert. denied, 333 U.S. 861, 68 S.Ct. 739, 92 L.Ed. 1140 (1948), held that the practice of admitting evidence obtained by unlawful search and seizure then followed in California did not render a prosecution removable under the "denial" clause, since although there might be a denial of a civil right, there was no denial of *equal* civil rights, "such as a discrimination against a particular race." [15] Finally, Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), lends strong inferential support to the conclusion that a claimed violation of the liberty guaranteed by the due process clause does not afford ground for removal. This was an action in a federal court to enjoin a threatened state criminal prosecution which, it was alleged, would deprive the plaintiffs of rights to freedom of speech and of religion—a

prosecution which, on the view of the appellants here, could have been removed under the present § 1443(2). The Court held that the action had been properly brought under what has become 28 U.S. C. § 1343(3) giving federal jurisdiction over suits to enforce claims under Rev. Stat. § 1979, now 42 U.S.C. § 1983, but that an injunction against the state prosecution had been correctly denied. It said, 319 U.S. at 163, 63 S.Ct. at 881, that "Congress, by its legislation, has adopted the policy, with certain well defined statutory exceptions, of leaving generally to the state courts the trial of criminal cases arising under state laws, subject to review by this Court of any federal questions involved," and "Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted." These remarks would hardly have been appropriate if the Court had thought the criminal proceeding sought to be enjoined was one whose removal was authorized under the "well defined statutory exceptions." [16]

Our view that § 1443(2) applies only to rights that are granted in terms of equality and not to the whole gamut of constitutional rights, is strengthened by the very different effects of the two constructions on federal-state relations. The former construction would mean, e. g.,—if the obstacle discussed in Section III of this opinion can be surmounted—that a freedman who was arrested for occupying property he had purchased

15. The importance of the Steele case lies in its recognition that "equal civil rights" are a narrower category than civil rights. A state procedural rule discriminating on racial grounds would, of course, furnish a basis for removal under § 1443(1), and a practice of discriminating in enforcement would likewise do so except for the Supreme Court decisions cited below. Whether the existence of such a practice gives "color of authority" to violate state laws is another matter, mentioned

above, which it is unnecessary to decide on these appeals.

16. It is hardly attributing "omniscience" to the Court that decided the Douglas case, see fn. 9 to the instant dissent, to suggest that a bench including Justices so devoted to the cause of civil rights and so expert in federal jurisdiction as Stone, Black, Frankfurter, and Douglas, would not have implied so strongly that the case before them could not have been removed without considering whether it could have been.

or for fighting off an evictor might remove on the basis that he was acting "by virtue of or under color of authority derived from" Rev.Stat. § 1978, or, in today's terms, that the same might be true of persons utilizing self-enforcement in respect of the rights "to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation," granted by § 201(a) of the Civil Rights Act of 1964. It could be argued in such cases that Congress had focused upon a particular problem and had decided that allowing removal to persons who had engaged in self-help to achieve certain specific goals was necessary to effectuate its purpose.

Such a construction would be altogether different from saying that the Congresses of 1875, of 1911, or of 1948 meant to authorize removal whenever a state suit or prosecution concerned what allegedly was an unconstitutional deprivation of the universal right to "liberty." Even if there were basis for somehow limiting this to civil rights demonstrators, the burden cast on the federal courts would be formidable, as recent events have shown. But a claim of such deprivation would also exist in the case of a suit or prosecution for publishing an allegedly lewd or subversive book, for exhibiting an obscene moving picture, for a speech claimed to constitute an incitement to riot, for libel of a public official, for parading for a political cause without a permit, for violating a Sunday law, for refusing to obey a public health measure offensive to a religious belief, or in other cases too numerous to mention. Neither do we see any reasonable basis whereby, on appellants' argument, only rights to liberty of the First Amendment type would afford basis for removal. Prosecutions for the practice of professions without a license, for the sale of articles alleged to be unconstitutionally banned, or for conduct which, it is claimed, the state has not prohibited with required specificity—all these and many more would come within the sweep of § 1443(2). Compare

Hornsby v. Allen, 326 F.2d 605, rehearing denied, 330 F.2d 55 (5 Cir. 1964). Although the unexpected character of such a wholesale transfer of jurisdiction from state to federal courts, the disruption of relationships incident to making the federal courts a major forum for state criminal trials, often at places remote from the scene of the crime, and the burden that would be placed on federal tribunals ill-equipped to shoulder new tasks of such magnitude, would not justify refusal to respond to a clear Congressional command, such considerations suggest the need for carefully attending to what Congress meant by § 1443(2) and its predecessors. Realizing the hindrance to interpretation resulting from the prohibition of direct review of remand orders since 1887, we think the presumption is still "powerful that such a far-reaching dislocating construction * * * was not uncovered by judges, lawyers or scholars for * * * years because it is not there." Romero v. International Terminal Operating Co., supra, 358 U.S. at 370–371, 79 S.Ct. at 479.

In recognition of the disruptive character of such a construction, the dissent seems to suggest a principle limiting invocation of the due process clause as regards § 1443(2) to cases where a protest concerns an alleged denial of substantive equal protection. But the guarantee of liberty in the due process clause either is or is not a law providing for equal rights within the removal statute, and if it gives "color of authority" for one type of protest, it does so for all. The First Amendment as incorporated in the Fourteenth protects speech and petition regardless of subject-matter; protests about nuclear armament, or substandard wages, or the grant or denial of public aid to parochial schools, are protected to the same degree as protests over the racial composition of public schools.

Because of the extensive review of the historical development of the relevant legislation demanded by the importance and the novelty of the issues and in order

to promote certainty as to our decision, we here summarize our conclusions:

(1) We reject the State's contention that the "denial" and the "authority" clauses of the civil rights removal statute should be read as one; the statute permits removal in either of two distinct categories of cases, today as it has since 1866.

(2) We reject any view that the "authority" clause of the civil rights removal statute can be invoked only if the petitioner preliminarily demonstrates that the challenged conduct was within the federal law relied on, the very issue on which he seeks a federal trial—subject only to the *caveat* that particular conduct may have gone so far beyond any possible interpretation of the rights allegedly conferred as not to furnish a colorable basis for removal.

(3) We do not decide whether the "authority" clause is limited to officers and persons assisting them or acting in some way on behalf of government, or whether private citizens exercising equal rights, such as the beneficiaries of the equal rights statutes of the Reconstruction era and of certain provisions of the Civil Rights Act of 1964, may invoke the "authority" clause of the statute as well as the "denial" clause.

(4) When the removal statute speaks of "color of authority derived from" a law providing for equal rights, it refers to a situation where the lawmakers manifested an affirmative intention that a beneficiary of such a law should be able to do something and not merely to one where he may have a valid defense or be entitled to have civil or criminal liability imposed on those interfering with him.

(5) When the removal statute speaks of "any law providing for equal rights," it refers to those laws that are couched in terms of equality, such as the historic and the recent equal rights statutes, as distinguished from laws, of which the due process clause and 42 U.S.C. § 1983 are sufficient examples, that confer equal rights in the sense, vital to our way of life, of bestowing them upon all.

It should be made clear that the obstacles we perceive to applying § 1443(2) to removal by civil rights demonstrators would not be at all present in cases where an appropriate showing was made for the invocation of § 1443(1). An allegation that Negroes engaged in civil rights demonstrations were being punished in the state courts whereas white persons engaging in similar demonstrations for other causes were not, cf. Cox v. Louisiana, supra, or that Negro demonstrators were required to post high bail whereas whites were not, would constitute clear instances of denial to "any person" of the right, provided by 42 U.S.C. § 1981, that all "shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." There is no possible doubt that § 1443(1) applies to the grantees of equal rights under the equal protection clause and egalitarian statutes,[17] and it imposes no requirement of showing "color of authority" or "inconsistency" although it does demand a substantial claim of denial or inability to enforce. The difficulty is that what is now § 1443(1) was largely deprived of effect by the decisions in Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880); Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881); and Com. of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906), which limited its application to denial by state laws as distinguished from state practice. The Congressional debate on Title IX of the Civil Rights Act of 1964 indicated a not unreasonable expectation that these restrictive decisions would be reexamined, see 110 Cong. Rec. 6739–40 (daily ed. April 6, 1964) (remarks of Senator Dodd), and the question is now before the Fourth Circuit in Baines v. City of Danville, No. 9080, and McGhee v. City of Danville, No. 9082. If that expectation should go unfulfilled, Congress may well do the re-

---

17. This consideration answers the point made in fn. 10 to the dissent and the text accompanying it.

examining or otherwise amend the centenarian civil rights removal statute—not, of course, by restricting the statute, as the dissent suggests, but by removing the restriction that had been judicially imposed on the first clause and by clarifying the scope of the second. But the relative inutility of § 1443(1) in the interval affords no warrant for embracing within the second clause of § 1443 cases of the type with which the first clause seems to be concerned, by means of a latitudinarian construction, unsupported by language and contrary to history, which, in order to meet conditions unhappily and, we hope, temporarily prevailing in a few states, would swamp the federal courts throughout the country with prosecutions removed as concerning acts allegedly protected by guarantees of the Fourteenth Amendment.

Although we fully recognize the merits of a case-by-case approach with respect to constitutional determinations, including any that may be relevant to these petitioners, we find this singularly unattractive as applied to the question where a suit should be tried—an issue which in the interests of both parties should be speedily determined without the necessity of lengthy preliminary hearings, on the very issues that will arise on the trial itself, by a court to which removal is sought. Removal under § 1443(2), unlike § 1443(1), does not depend on conditions in a particular state or as to a particular trial; it ought be possible for a court to lay down some general principles for its construction. Our dissenting brother is quite right in saying that we have not succeeded in furnishing a definition of "color of authority" that will automatically determine every case, and we plead guilty to having postponed the issue whether § 1443(2) may ever be invoked by persons other than officers or quasi-officers to a case where its decision is required. But at least we have taken the difficult road of deciding these cases as best we can, thereby giving indications that also ought be somewhat useful for the decision of others, rather than permitting these serious questions to rest in limbo while words which could not alter the result are added to the removal petitions, lengthy hearings are held in the district courts and the proceedings ultimately return here.

The orders of remand are affirmed.

KAUFMAN, Circuit Judge (concurring).

Judges do not live in ivory towers; they realize that their opinions are frequently misunderstood, misinterpreted and read otherwise than intended. Since this appeals raises extraordinarily delicate problems, which have been explored in Judge Friendly's able opinion, and so many of which may have an important impact in the civil rights area and on the administration of the federal courts, I deem it my responsibility to elucidate my reasons for concurring in today's decision.

Weighty problems in the sensitive area of federal-state relationships are involved in what the nation's press has recently termed "the rage to remove." Time Magazine, Oct. 30, 1964, p. 88. On the one hand, the already overburdened lower federal courts should not be deluged with every state criminal case bearing any alleged connection to civil rights no matter how slight unless this is mandated. At the same time, we would be closing our eyes to the practical realities of the contemporary national scene if we did not recognize, along with Congress, that federal rights would have only paper meaning if state criminal prosecutions could never—whatever the circumstances—be removed to the federal courts.

Judges are not "forbidden to know as judges what [they] see as men." Ho Ah Kow v. Nunan, 5 Sawy. 552, 560, Fed. Cas.No.6,546 (1879). The necessity for a federal forum is not confined to specified regions of the country. Guarantees of equality may be ignored on both sides of the Mason-Dixon line, compare Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), with

Taylor v. Board of Education (New Rochelle, N. Y.), 191 F.Supp. 181 (S.D. N.Y.), aff'd, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), and on either of our ocean coasts, compare Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), with Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The conditions which justify removal, not their geographic setting, provide the predicate for our constitutional and statutory duties.

This makes it all the more important that we be unmistakably clear as to our present holding. But it does not require us to settle, once and for all time, every problem which might conceivably arise under an imprecise and inexpertly drafted section of a statute, almost 100 years old and never before applied in the manner the appellants urge. As appellate judges we have an obligation to lay down guidelines as clear as the circumstances permit for the federal district courts and to avoid an overly technical approach that will have meaning only for the cases before us. At the same time, I am mindful of Senator Dodd's recent recognition in the debates leading to passage of the 1964 Civil Rights Act that it is extremely difficult to specify with precision the kinds of cases which ought to be removable under Section 1443. 110 Cong.Rec. 6739–40 (daily ed. April 6, 1964). My decision to concur is made in the light of these competing considerations.

I agree with Judge Friendly that it is unnecessary to decide and that we have not decided whether subdivision (2) covers only officers and those persons assisting them or acting in some way in behalf of government. In this connection, it seems imperative that we, as well as Congress, recognize that federal intervention has all too often proved essential to safeguard federal rights from state emasculation, and that some state courts unfortunately have not been immune to the epidemic of prejudice and intolerance. Against such a background, the statutory right of removal in certain instances appears but another effort to provide a measure of federal protection for the rights of the Negro. We have not decided today whether for the private citizen that right exists only in a § 1443(1) situation, in which removal has been judicially confined to limited, and perhaps unduly restrictive, situations. See Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880); Com. of Kentucky v. Powers, 201 U.S. 1, 126 S.Ct. 387, 50 L.Ed. 633 (1906).

I also believe that subdivision (2) was intended to apply to state prosecutions for acts done under the color of authority of rights stated in terms of equality, but not to acts protected by the general constitutional guarantee of liberty. The statute, in short, is applicable where the persons seeking removal are being prosecuted for doing something which a specific federal law providing for equal rights gave them the impetus and authority to do. This would seem to mean, as Judge Friendly has articulated, that removal is available to persons arrested for acts connected with the self-enforcement of the right to full and equal enjoyment of the facilities of hotels, restaurants, theatres, and other public places. And the right to remove in such cases is of vital significance for it gives meaning to Congress' enactments ensuring equal rights and its directions and authorizations, express or implied, that the beneficiaries should enjoy those rights free from restraint by the states; the federal courts, in those instances, will be available to make the rights viable.

Since the Bill of Rights and the Fourteenth Amendment were intended to safeguard the fundamental rights of individuals against governmental impairment, judges are sorely tempted, when the state's awesome powers must be weighed against the citizen's rights, to stretch the meaning of statutes in order to strike the balance in favor of the individual. But, Justice Cardozo reminded us in his typically poignant language, that a judge "is not a knight errant roaming at will in pursuit of his own idea of beauty or of goodness * * *

He is not to yield to spasmodic sentiment, to vague and unregulated benevolence * * * " The Nature of the Judicial Process 144 (1921).

A caveat is in order here. I must emphasize that we are not saying the petitioners are forever barred from coming into the federal courts to protect their constitutional rights. Indeed, the contrary is true, for if convicted in the state courts, they may still seek review in the Supreme Court or invoke the time-honored writ of habeas corpus in a federal court to vindicate their federal rights. The Supreme Court's recent decision in Hamm v. City of Rock Hill, 85 S.Ct. 384 (1964), directly reviewing state court convictions, is striking proof of the cloak of federal protection afforded individuals in prosecutions by the states. The Court's holding that it is not a crime to attempt peacefully to secure equal treatment in a place of public accommodation indicates a willingness not only "to obliterate the effect of a distressing chapter of our history," but also to give full meaning to the constitutional guarantee of equal treatment under the law for all citizens. See also Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

Because the problem before us is so difficult, my brothers have discussed extensively whatever authorities they believe shed some light on its resolution. But, with this done, it is important to place in proper focus the sole question we face. By our decision today we are attempting to unravel the words of a statute, not constitutional rights, and to decide whether the petitioners in this case are entitled *in the first instance* to a federal trial of a state charge. I do not believe that they are for all available evidence which would help us resolve the meaning of this ambiguous statute points in the other direction.

If our reading of § 1443(2) in this difficult and uncertain area is too narrow, Congress is still available for enlargement or clarification of the statute, which all on this panel agree lacks clarity. If removal should be more freely available, legislative consideration and action can best bring about a fair accommodation of the competing interests. The function of weighing and appraising the host of factors involved, were we to adopt the novel argument urged upon us for removal of these cases under an amphibolic subdivision of such an antique and venerable statute, is "more appropriately for those who write the laws, rather than for those who interpret them." United States v. Gilman, 347 U.S. 507, 513, 74 S.Ct. 695, 698, 98 L.Ed. 898 (1954). As Mr. Justice Frankfurter once perceptively noted, "where policy is expressed by the primary lawmaking agency in a democracy, that is by the legislature, judges must respect such expressions by adding to or substracting from the explicit terms which the lawmakers used no more than is called for by the shorthand nature of the language." Westin, The Supreme Court: Views from Inside 83 (1961).[1] Indeed, the suggestion in the dissenting opinion that the loose conglomeration of inartistic petitions disables us from giving guidance for future litigation, together with a candid recognition that formulation of a clear, all-encompassing standard is virtually impossible, indicates that it

---

1. Practical considerations should never impede judicial recognition of an individual's right to redress in the federal courts. But if the right of removal under § 1443 (2) is to be broadened, Congress can consider the insurmountable burdens that would, for example, be cast upon the nine judges of the Federal District Court for the Northern District of California if the 814 Berkeley students recently arrested for free-speech demonstrations on the college campus were entitled to remove their prosecutions to the federal court on the ground that they were protesting alleged violations of the equal protection clause. As recently as 1961, Congress recognized the plight of the overburdened federal courts by creating 73 new judgeships. 75 Stat. 80 (1961). Further Congressional action along such lines would seem to be a necessary corollary to enlargement of the removal jurisdiction.

is for Congress, not us, to adopt a broader reading.

With this exposition of my views, I concur in Judge FRIENDLY'S thorough opinion.

MARSHALL, Circuit Judge (dissenting).

The vague and conclusory allegations in the ten removal petitions, covering almost sixty persons, involving many separate offenses for a variety of acts, some done on different days and different places, the willingness of the state to waive all objections to "formal" defects in the removal petitions in order to establish a "precedent", and the presentation of all these removal petitions on appeal as one conglomerate have profoundly obscured the issue for our determination. Judge Friendly, with his usual scholarly excellence, has met the apparent insurmountable task of dealing with these appeals on this basis and he has attempted to delineate the general scope of 28 U.S.C. § 1443(2). However, I am convinced that the problem presented by these cases can only be decided case by case and on the basis of informative petitions, see 28 U.S.C. § 1446(a) (requiring "a short and plain statement of the facts"). Moreover, I find myself in disagreement with the basic conclusion of the majority opinion and therefore dissent.

The importance of approaching these appeals on a case-by-case basis cannot be overestimated. A great array of charges, including assault third, disorderly conduct, maintaining a nuisance, resisting an officer, obstructing railway cars, unlawful intrusion, unlawful assembly, loitering at a school building and including truancy, are involved in this assortment of removal petitions, and yet the conglomerate presentation and disposition of these appeals tend to ignore the possibility that a difference in the specific conduct charged might make a difference under § 1443(2). For example, if the petitioners arrested and prosecuted for violating the truancy law had merely sought to induce parents not to send their children to a segregated school which denies the "equality of law" guaranteed by the Constitution, this, in my opinion, could be a case covered by § 1443(2), while, on the other hand, a charge of third degree assault might very well not be covered.

Moreover, even on the majority's view that the conduct involved in all these petitions can be reduced to protests against racial discrimination and segregation, some of the petitioners might well be entitled to removal under the majority's own interpretation of § 1443 (2). I understand my brothers to suggest that under § 1443(2) removal might be available to individuals arrested and prosecuted for taking self-help measures to secure equal treatment guaranteed by federal laws providing for equal rights, and further that a peaceful protest might be considered such a self-help measure.[1] The majority insists that this issue is not present in these appeals and that no words could be added to the removal petitions that would change their affirmance of all the remands. However, I am not so confident. Some of the petitioners, at least those charged with loitering at a school building and inducing truancy, might well have been doing nothing more than peacefully picketing a public school under the belief that it was a segregated public school maintained in violation of the Equal Protection Clause. Any doubts as to whether this is the alleged factual pattern should, in all fairness, be resolved by affording petitioners an opportunity to amend. For the removal petitions were drafted primarily with the first clause of § 1443 in mind and this is a case of first impression, involving a previously unexplored part of § 1443 and raising wholly unique and delicate issues. I refuse to rely on the fact that the protests were widely publicized and much less on the failure of appellants to fill in the supposed missing facts during oral argument or in their not-so-thorough briefs; this lapse could be readily explained by the fact that the majority's

1. See infra pp. 277-280.

interpretation of § 1443(2) could hardly have been anticipated.

My brothers' desire to help the district courts in this circuit, the Supreme Court and even Congress by exposing the problems and stating what is "their proper solution under existing law" is indeed commendable. However, we have long learned that this desire can only be satisfied, at least for federal judges, through the decision of a particular case on the basis on a readily discernible set of facts. And, although I may be unduly skeptical, I have some serious doubts as to whether my brothers' decision will provide any of their hoped-for "guidance." Distinction is built upon distinction, and the clarifying foundation of a single factual pattern is lacking; and the obvious and frequent need to spell out what is *not* being decided today amply reveals the danger of abstract opinions.

I do not intend to pass judgment on these cases, either individually or collectively. Yet certain propositions in the majority opinion urgently require comment, even at the risk of joining the rather abstract discussion.

My disagreement with the majority's interpretation of § 1443(2) stems from its refusal to recognize any meaningful color of authority emanating from the Fourteenth Amendment.

The "color of authority" concept of § 1443(2) is not correctly described or defined. The majority suggests that in order for a law to provide "color of authority" to perform an act, it must do more than protect conduct by giving remedies to the offended party—it must be "an encouragement" or must "direct" the individual to act.

This seems to be a rather obvious departure from common usage and understanding. An individual acts under the "color of authority" of a law at least when his conduct is protected by that law, when interferences with that activity are unlawful and the subject of civil or criminal legal remedies. To say that "something more" than this protection is required is illusory, granted that we are talking about individuals acting in a non-official capacity. The most familiar legal technique for "encouraging" certain private activity is to make interferences with that activity unlawful. And one does not have to fully embrace Mr. Justice Holmes' positivism, see *The Path of the Law*, 10 Harv.L.Rev. 457 (1897) to realize that usually or invariably unlawful conduct is the subject of civil or criminal sanctions, or, to look at it from the view of the "offended party" rather than the "bad man," that unlawful conduct is the subject of civil or criminal remedies. The law not only protects conduct by making interferences with it unlawful, but also by providing legal remedies against such interferences.

The majority, while apparently conceding that this is the usual understanding of the words "color of authority," insists that the "particular context" in which these words are used requires a much more restrictive interpretation. One alleged aspect of this context is that § 1443(2) "indubitably applies" to officers and quasi-officers. But I fail to appreciate the significance of this fact. Either the assumption underlying our analysis of the "color of authority" concept, to borrow a thought from the majority, "is or is not" that the section is also applicable to non-officers. The manner in which a private person acts under the authority of a law need not be the same as that of an officer. Furthermore, there is no reason for supposing that an officer acts under the "color of authority of any law providing for equal rights" only in the rather limited situation when there is a statute or order specifically directing him to do some particular act. Cf. Cunningham v. Neagle, 135 U.S. 1, 58–59, 10 S.Ct. 658, 666, 34 L.Ed. 55 (1890). The second alleged aspect of the "particular context" is that the first clause of § 1443 uses the phrase "a right under" rather than "under color of authority." The majority concludes that "It necessarily follows that 'under color of authority derived from' in § 1443(2) has a narrower meaning than 'a right under' in § 1443 (1) . . . . ." It seems to me, how-

ever, not that one phrase is necessarily "narrower" than the other, but that the special province of § 1443(1) is the denial of equal rights in the course of proceedings in state courts, while § 1443(2) focuses on the denial of equal rights in different situations. This shift focus adequately explains the change from "a right under" to "under color of authority."

One aspect of the "particular context" seems to escape the majority, namely, that the "color of authority" referred to in § 1443(2) is to be derived from "any law providing for equal rights." The words "color of authority" should not be read in isolation but rather as an integral part of the phrase "color of authority derived from any law providing for equal rights." The majority readily admits that the Equal Protection Clause and all the civil rights statutes are laws providing for equal rights. Yet at the same time the words "color of authority" are so construed as to virtually preclude any of these laws from ever giving what is deemed to be the requisite kind of authority. In construing what the phrase "color of authority derived from any law providing for equal rights" means it would be fair to presume that the kind of authority required would be of the type generally provided by the

laws providing for equal rights. For the most part, these laws do not explicitly and specifically "encourage" and "direct" people to do things in the stringent sense suggested by the majority. Instead they protect certain activity by declaring interferences with that activity unlawful and by providing civil and criminal remedies.[2] To interpret the "color of authority" concept more stringently would virtually make § 1443(2) unavailable, even to officers, in the bulk of civil rights cases, the acknowledged province of that section.

On occasion the majority makes a generous reference to the Civil Rights Act of 1964 and the other civil rights statutes, and intimates that they might provide the "color of authority" for protests seeking to secure the equal rights guaranteed by these laws. I doubt whether this comports with the majority's stated definition of the "color of authority" concept, and, if it does, I must once again express my doubt as to whether the majority is being consistent in affirming the remand of all these cases. For example, appellants arrested for loitering at a school building and inducing truancy might well have been doing nothing more than peacefully picketing a segregated public school maintained in violation of the Equal Protection Clause.[3] This

2. Appellants could conceivably argue that if the state permits or would permit protests or expressions of dissatisfaction by other groups and for other causes, then they were acting under the color of authority of the Equal Protection Clause or § 1981, certainly laws providing for equal rights, in that they command the State not to interfere with them and thereby protects that activity, see Niemotko v. State of Maryland, 340 U.S. 268, 272, 71 S.Ct. 325, 95 L.Ed. 267 (1951); cf. Steele v. Superior Court of California, 164 F.2d 781, 782 (9 Cir. 1947), cert. denied, 333 U.S. 861, 68 S.Ct. 739, 92 L.Ed. 1140 (1948), and Hill v. Com. of Pennsylvania, 183 F.Supp. 126 (W.D.Pa. 1960), both suggesting that there would be removal (though not specifying whether it would be under subdivision 1 or 2 of § 1443) if the arrest or prosecution was alleged to violate the Equal Protection Clause. The majority insists that appellants do not urge that the interferences,

arrests and prosecutions of appellants had the purpose and effect of discriminatorily or unequally denying them of their rights to speak, assemble and protest grievances. But, given the confusing presentation of all these removal petitions and the fact that only during oral argument did we learn that petitioners have decided to rely exclusively on the second subdivision of § 1443, I fail to see how the majority could be so confident.

3. Some of the petitioners apparently allege that they were protesting against the denial of rights guaranteed by civil rights statutes. 42 U.S.C. § 1981 guarantees, among other things, the right to be free from discriminatory and unequal treatment by police, and some of the petitioners claim that they were protesting against the denial of this right (one aspect of "police brutality"). Some petitioners also seem to allege that they were protesting against "the denial of

clause is no less a law providing for equal rights than the Civil Rights Act of 1964 and the other civil rights statutes, and it confers the same type and quantum of authority. The affinity between the Fourteenth Amendment and the civil rights statutes is far more than obvious. As Chief Justice Vinson wrote in Hurd v. Hodge, 334 U.S. 24, 32, 68 S. Ct. 847, 851, 92 L.Ed. 1187 (1948):

> "It is clear that in many significant respects the statute [the Civil Rights Act of 1866] and the [Fourteenth] Amendment were expressions of the same general congressional policy. Indeed, as the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land."

See generally Frank & Munro, The Original Understanding of "Equal Protection of the Law," 50 Colum.L.Rev. 131 (1950).

That the Equal Protection Clause provides for "equal rights" cannot be doubted and there is no reason why the word "law" in § 1443(2) should be confined to Congressional enactments, nor why only Congressional enactments could confer the type of "authority" required by § 1443(2). Such an artificial and unduly restrictive position has been rejected in other contexts, see, e. g., Cunningham v. Neagle, 135 U.S. 1, 10 S.Ct. 658 (1890), and it ignores the fact that there would be little reason for putting in a Congressional statute what was already provided for by a constitutional amendment. Obviously the reason Congress did not explicitly include within, for instance, the Civil Rights Act of 1964 a flat prohibition condemning segregated education is that it operated on the rather reasonable presumption (see Title IV, now 42 U.S.C. §§ 2000c–2000c–9) that this denial of equal rights was already proscribed by the Equal Protection Clause, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Although the Fourteenth Amendment "makes no attempt to enumerate the rights it was designed to protect" but "speaks in general terms," these terms "are as comprehensive as possible" and create a "positive immunity" against state-imposed racial discrimination, Strauder v. West Virginia, 100 U.S. 303, 307, 308, 25 L.Ed. 664 (1880). If, according to the majority, removal under § 1443(2) might possibly be available to individuals peacefully protesting against segregated public accommodations, it is difficult to see why removal would not be equally available under § 1443(2) to individuals peacefully protesting against segregated public education.

Some appellants seem · to rely on a theory of self-help, and it seems important to state their argument in all its fullness, putting to one side any interest in determining whether it is tacitly acknowledged in the majority opinion. As the Supreme Court recently stressed in Hamm v. City of Rock Hill, 85 S.Ct. 384 (1964), some measures undertaken by private individuals to secure rights guaranteed by a law providing for equal rights may well come within the protection of that law and these individ-

---

the equal protection of the laws to Negroes in the city, state and nation with reference to housing" and although such an allegation is vague, conclusory, and totally inadequate, conceivably these petitioners might claim, if they were even given an opportunity to do so, that they were protesting against racial discrimination in federally assisted housing that violated the President's order, Executive Order No. 11063, Nov. 21, 1962, 27 F.R. 11527, "Equal Opportunity in Housing"; and

there seems to be some authority for the proposition that an executive order is within the ambit of the word "law" in the § 1443(2) phrase "any law providing for equal rights," see Hodgson v. Millward, 12 Fed.Cas. No. 6, 285 (No. 6568) (C.C.E.D.Pa.1863) (see 3 Grant (Pa. 1863) 412, for the facts), approved in Braun v. Sauerwein, 10 Wall. 218, 224, 19 L.Ed. 895 (1869).

Cf. also Hamm v. City of Rock Hill, 85 S.Ct. 384 (1964).

uals may well be acting under the authority of that law. Moreover, appellants could reasonably argue that if, for example, it would be a form of self-help for a Negro to attempt to register in a state university that the state has sought to maintain exclusively for the whites, then the same Negro would be employing a form of self-help to eliminate the denial of his equal rights if he picketed the university after the officials refused to register him because of his race. The difficult problem is to determine which types of self-help measures come within the ambit of protection and authority of the law granting the equal rights, or more specifically, whether appellants' alleged peaceful[4] protest and demonstration against the denial of these rights falls within that ambit.

Two factors must be considered in grappling with this problem. First, peaceful protest, speech and petition, is a form of self-help not unknown during the era of Reconstruction when § 1443 (2) was forged, see, e. g., Aptheker, A Documentary History of the Negro People in the United States, 536–37 (1951); McPherson, The Negro's Civil War, 245–70 (1965). Secondly, this form of self-help—peaceful protest and demonstration—is tremendously important in our federal constitutional scheme. It is constitutionally protected, see Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). As Mr. Justice Harlan asserted in his concurrence in Garner v. State of Louisiana, 368 U.S. 157, 201–202, 82 S.Ct. 248, 271, 7 L.Ed.

2d 207 (1961), in regard to a similar form of self-help, the peaceful sit-in,

"It, like speech, appeals to good sense and to 'the power of reason as applied through public discussion,' Whitney v. People of State of California, 274 U.S. 357, 375 [47 S.Ct. 641, 648, 71 L.Ed. 1095] (Brandeis, J., concurring), just as much as, if not more than, a public oration delivered from a soapbox at a street corner * * * If the act of displaying a red flag as a symbol of opposition to organized government is a liberty encompassed within free speech as protected by the Fourteenth Amendment, Stromberg v. People of State of California, supra [283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117] the act of sitting at a privately owned lunch counter with the consent of the owner, as a demonstration of opposition to enforced segregation, is surely within the same range of protections."

See Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Fields v. South Carolina, 375 U.S. 44, 84 S.Ct. 149, 11 L.Ed.2d 107 (1963); Henry v. City of Rock Hill, 376 U.S. 776, 84 S.Ct. 1042, 12 L.Ed.2d 79 (1964).

This seems to be the relevance of the Due Process Clause to appellants' arguments. It is not that the Due Process Clause, in isolation and of its own force, is a "law providing for equal rights," under whose authority appellants allegedly acted, but rather that appellants sought to effectuate the mandates of the

---

4. Presumably the question whether the protests were peaceful is to be determined in the federal district court. See Hodgson v. Millward, 12 Fed.Cas. 285 (No. 6568) (C.C.E.D.Pa.1863); cf. Tennessee v. Davis, 100 U.S. 257, 261–262, 25 L.Ed. 648 (1879) (federal officer case). See generally Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (habeas corpus), stressing the importance of a full and fair evidentiary hearing in a federal forum when federal constitutional rights are at stake.

At one point the majority suggests that the "law" invoked by petitioners as the "law providing for equal rights" must provide the (color of) authority "for disregard of [state] laws providing for the equal punishment of disturbers of the peace." But this is either to misread § 1443(2) or to misunderstand the position of some of the petitioners. Some seem to insist that they were doing nothing more than peacefully picketing, not in the least unlawful in New York; and they claim that they *acted* under the color of authority of federal laws providing for equal rights, all that is required by § 1443(2), not that they *violated state laws* under the color of authority of federal laws providing for equal rights.

Equal Protection Clause, or the Fourteenth Amendment as a whole, and did so in a way that is allegedly protected by the Due Process Clause, or the Fourteenth Amendment. We should approach the problems inherent in some of these petitions, not by severing and separately compartmentalizing the Due Process and Equal Protection Clauses, but realizing that they are both part of the same constitutional amendment, undoubtedly the most basic of all laws providing for equal rights, and that these clauses often intersect. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Some appellants, perhaps those arrested for loitering at a school building and inducing truancy, might be able to allege such an occasion has arisen and argue that this was the "law" under whose authority they acted. Yet given the conglomerate approach of the majority, the vague, conclusory and uninformative character of the pleadings, and the failure of the district courts to get beyond the pleadings, it seems impossible and inappropriate for us to assess this argument now.

I will say, however, that there seems to be little basis for the majority's fear that if any of the appellants who were peacefully protesting are entitled to removal under § 1443(2), then "whenever a state suit or prosecution concerned what allegedly was an unconstitutional deprivation of the universal right to 'liberty' " removal would be possible. A limiting principle could perhaps be found in the fact that the liberty involved in some of these removal petitions is the liberty to express dissatisfaction with the state's alleged denial of equal rights. The purpose and form of the exercise of liberty is not without significance, for, as seen in this light, the exercise of this liberty is merely another form of self-help to secure the rights guaranteed by the Equal Protection Clause or other federal laws providing for equal rights.

The majority's effort to resolve some of the basic questions raised in these appeals by reconstructing the intention of the Congress of 1875 [5] is also troubling. The thrust of the argument is to show that the Due Process Clause is not a "law providing for equal rights" within the meaning of § 1443(2). Although I do not think that appellants' argument need stand or fall on that proposition, I gather that the majority is prepared to turn the edge of its argument to meet any interpretation of § 1443(2) that would entitle any of the petitioners to removal under any set of facts they could reasonably allege. I therefore must insist that "this is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute," Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956). Legislative history may often shed light on the meaning of a statute, yet we have learned before that little authoritative information can be obtained from the legislative history of the civil rights legislation of the last century, see Brown v. Board of Education, 347 U.S. 483, 489, 74 S.Ct. 686, 688, 98 L.Ed. 873 (1954).

In attempting to reconstruct "the intention" of the 1875 Congress, the majority relies not on debates or reports or statements by the revisers or legislators, few of which were specifically addressed to what is now subdivision 2 of § 1443, but rather on the proposition that no such far-reaching result as would follow from allowing removal to some of these petitioners could have been intended. For the most part the proposition rests on the argument that the codifiers of 1875 were responsible for the phrase "under color of authority derived from any law providing for equal rights" and that "so great a substantive change" as would flow from allowing removal under § 1443 (2) could not have been intended to be accomplished by "what was represented to be a mere codification." However, two points can be made; first, it is not at all clear that in the eyes of the 1875 legislators and revisers none of petitioners would have been entitled to removal un-

5. See footnote 7 in the majority opinion.

der the law existing prior to the codification, and secondly, in order to understand how far reaching and radical the change would be, one must place the civil rights removal provisions in its historical context, if any assessment of the intention of the 1875 Congress is to be made.

In support of the first point, appellants could make a strong argument that the 1875 revisers used the phrase "any law providing for equal rights" as a shorthand technique for referring to all the three previous civil rights acts, the Civil Rights Act of 1866,[6] the Civil Rights Act of 1870 (sections 16 and 17 of which are now 42 U.S.C. §§ 1981 and 1982), and the Civil Rights Act of 1871 (§ 1 of which is now 42 U.S.C. § 1983), not to mention the Fourteenth Amendment. Or, to put it another way, the majority concedes, that the phrase "any law providing for equal rights" referred to the first and second Civil Rights Acts of 1866 and 1870, and the burden is then cast upon it, to show that the revisers or Congress did not intend to include, or rather intended to exclude, the third act in this series of civil rights legislation from this supposedly "readily explicable" reference to "any law providing for equal rights."[7] Thus burden would seem to be intensified by the text of 42 U.S.C. § 1983 when it was original-

6. The majority emphasizes that none of the acts of which § 3 of the Civil Rights Act of 1866 was originally linked (§ 1 of the 1866 and the Freedmen's Bureau Act) spoke of protecting "freedom of speech or petition against state infringement." However, section 1 of the Civil Rights Act of 1866 provided in part "all persons born in the United States * * * of every race and color, without regard to any previous condition of slavery or involuntary servitude * * * shall have the same rights * * * to full and equal benefit of all laws and proceedings for the security of person and property * * *" Given the fact that the 1866 Act preceded the enactment of the Fourteenth Amendment, although it followed the enactment of the Thirteenth Amendment, this catch-all and vague phrase "full and equal benefit of all laws" might have been intended to afford some measure of protection to the freedom of speech and petition guaranteed by the First Amendment and similar state constitutional provisions for those attempting to secure the full measure of equality for the freedmen. Cf. Hurd v. Hodge, 334 U.S. 24, 32, 68 S.Ct. 847, 92 L.Ed. 1187 (1948).

7. The majority's discussion of the legislative history is prefaced by the statement "all that is 'authorized' by the statutes [42 U.S.C. §§ 1983 and 1985] * * * is the award of damages or of criminal punishment." The question is not, however, whether the "law providing for equal rights" authorized the protests in the way that a principal may have "authorized" an agent, but rather whether the individual acted under the authority of that law. As suggested earlier, supra p. 276, an individual would be acting under the authority of the law if he were protected in that activity by that law; and although § 1983 does not provide the grant of substantive rights, it presumes or tacitly incorporates the grant in the Fourteenth Amendment (§ 1983 was originally enacted as section 1 of the 1871 Act "to enforce the Provisions of the Fourteenth Amendment * * *" 17 Stat. 13) and one of the fundamental means of protecting any conduct is, as § 1983 does, to provide a legal remedy for interferences with that activity. If petitioners would have a remedy under § 1983, against those interfering with their conduct, they could well argue that they were acting under the "color of authority" of § 1983.

The mere fact that § 1983 is "coextensive with the whole reach of the Constitution" does not preclude the possibility that it is a "law providing for equal rights," and much less that it could not have been viewed as such by the 1875 legislators and revisers. The deprivation of constitutional rights stemming from racial discrimination are certainly proscribed, and remedies provided, by that law, and this seems to have been the primary concern of the legislators, see generally Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The more difficult question to resolve is whether § 1983 could also be viewed as "a law providing for equal rights" when the deprivation of constitutional rights does not stem from racial discrimination. This would create the further problem of deciding whether a law could be classified as a "law providing for equal rights" for all purposes, if in one primary sense it does provide for equal rights.

ly enacted in 1871 as part of the third Civil Rights Act:

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication"; and the other remedial laws of the United States which are in their nature applicable in such cases."

Appellants could argue that the language "other remedies provided in like cases in * * * [the federal] courts, under the [1866] act" as well as "and the other remedial laws of the United States which are in their nature applicable in such cases" was a sufficient basis for the 1875 revisers and legislators to have believed or assumed (but see footnote 12 in the majority opinion arguing only that this assumption or belief might have been mistaken) that all of § 3, including the removal provisions, of the 1866 Act was already available to those claimed that they were being prosecuted for exercising the rights protected under § 1983; and that by using the phrase "any law providing for equal rights" they would also be referring to this law. This argument could be further strengthened by the fact that the second Civil Rights Act of 1870, which the majority recognizes as a "law providing for equal rights" within the meaning of § 1443 (2), incorporated the removal provisions by a similar summary reference to the Act of 1866;[8] the revisers and legislators might have assumed that if such a reference could make the removal provisions of the 1866 Act available in connection with the rights protected by the 1870 Act, the same would be true for the 1871 Act. I do not pass judgment on this argument, but I have spelled it out only to reveal one of my many reasons for believing that any attempt to reconstruct the intention of the 1875 legislators, even if it is agreed that their primary purpose was codification, is likely only to yield uncertainty and indecisiveness.[9]

---

3. "Section 18. AND BE IT FURTHER ENACTED, That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act."

It should be noted that the Civil Rights Act of 1870 was considered the first enforcement act (entitled "An Act to enforce the Right of Citizens of the United States to vote in the Several States of the Union and for other Purposes") and the Civil Rights Act of 1871 considered the second enforcement act; this would support the tendency to view them together, as the members of the same class—"any law providing for equal rights."

9. Presumably the majority would have us believe that the use of the disjunctive "or" in what is now 28 U.S.C. § 1343, implies that the 1875 Congress perceived a sharp distinction between on the one hand, rights "secured by the Constitution," and, on the other hand, rights "secured by any law providing for equal rights," and that a Congress that set up these two different categories would not view the Constitution, or any part of it, as being a "law providing for equal rights."

Secondly, in determining how "great a substantive change" would be wrought, some insight into the 1875 legislators' view of proper federal-state relations is required, if any reliance is to be placed on legislative history. The legislators of the Reconstruction Era saw the federal courts as a necessary and perhaps the most appropriate forum for the protection of federal rights. This conception was expressed in, for example, the Act of April 9, 1866, 14 Stat. 27, § 3 of which was the first step toward the present § 1443; the Act of February 5, 1867, 14 Stat. 385, the habeas corpus statute (now 28 U.S.C. § 2241(c) (3)) providing a federal forum to try a state prisoner's claim that he is being deprived of liberty in violation of the Constitution, see Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); the Act of April 20, 1871, 17 Stat. 13, the antecedent to §§ 1983 and 1985 giving the federal courts original jurisdiction to remedy, either in a civil or criminal action, claimed violations of federal constitutional rights, see Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); and the Judiciary Act of March 3, 1875, § 1, 18 Stat. 470, giving the federal courts original (28 U.S.C. § 1331) and removal (28 U.S.C. § 1441) jurisdiction of civil actions where "the decision depends upon the determination of"

This does not, however, meet the argument that § 1983 is a "law providing for equal rights." Moreover, the use of the disjunctive does not necessarily imply two mutually exclusive categories; for example, the Equal Protection Clause, concededly a law providing for equal rights, might well fall into both categories. Instead, the use of the disjunctive suggests to me that some legislators believed that some of the civil rights acts have guaranteed more rights than the Constitution, or that in the future other statutes, such as the fourth Civil Rights Act, Act of March 1, 1875, § 3, 18 Stat. 335, 336, would do so, or that some legislators believed that not every part of the Constitution guaranteeing rights, privileges and immunities is also a "law providing for equal rights." Appellants could make this latter point with little damage to a position that maintains that the Equal Protection Clause or the Fourteenth Amendment as a whole is a law providing for equal rights. For certain of the "basic guarantees," such as the prohibition against states passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts" (Article I, section 10, clause 1), have little relation to the Equal Protection Clause, or the Fourteenth Amendment, although the Civil War Amendments contributed to the demise of the Dred Scott decision, Scott v. Sandford, 60 U.S. 393, 15 L.Ed. 691, by making it abundantly clear that the freedmen were "citizens" of the United States and entitled to all the rights, privileges and immunities of such citizens.

This last point could perhaps serve as a source of distinguishing, if one deems it necessary to do so, the passing remarks of Justice Harlan in Gibson v. Mississippi, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075 (1896), a case involving a claimed violation of the prohibition against ex post facto laws. There is a more direct relationship to the Fourteenth Amendment when some petitioners claim that they were exercising a "liberty" protected by that Amendment to pressure the state to cease denying its Negro citizens "the equal protection of the laws" guaranteed by that Amendment.

On the issue of case authority invoked by the majority, I might add that it is difficult to see how Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) provides "inferentially" or otherwise, "strong" authority for the remand of all these petitions, even ignoring the fact that that case involved "freedom of speech and of religion" and that case need not be removable under § 1443(2) on what I understand to be "the view of the appellants here." The possibility of remand was not considered in the briefs or opinions, and I venture to say that Justices are not so omniscient that it would be fair for the majority to presume that they considered the possibility of removal under § 1443(2) when they held that a federal court could not enjoin a state prosecution; just as there is a difference between enjoining police officers under 42 U.S.C. § 1983 and removal under 28 U.S.C. § 1443, there is a difference between removing a prosecution to another forum and enjoining that prosecution.

a federal question, see Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 201, 41 S.Ct. 243, 246, 65 L.Ed. 577 (1921). Conceivably legislators today might well wish to exclude the Fourteenth Amendment from the ambit of the § 1443(2) category of "any law providing for equal rights," but that has little bearing on what the legislators of 1875 "intended", and it is hardly a justification for us to interpret the past product of Congress to achieve that result. Given the fact that after the Reconstruction Era non-majority power blocs have long been able to prevent Congress from acting, and even deliberating, to secure and protect civil rights, it would not be unfair for us now to await for Congress itself to decide through the constitutionally proscribed procedures whether it wishes to restrict one of the significant statutory gains of the Reconstruction Era. I would presume, however, that the Congress that enacted Title IX of the Civil Rights Act of 1964 in order to make meaningful the right to remove in civil rights cases would not be so inclined, to say the least.[10] This Congress did not expect us to limit subdivision 2 of § 1443 as Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880), Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1880), and Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633 (1906), had limited subdivision 1.

I would vacate the orders of remand, return the cases to the district courts, afford appellants an opportunity to amend their removal petitions, and have the district courts conduct full hearings on adequate pleadings to determine whether any of petitioners were being prosecuted for acts done under color of authority derived from any law providing for equal rights.

10. See, e.g., the statement of one opponent of the Civil Rights Act of 1964: "The catalogue of lawsuits which title IX would affect incorporates, among others, all suits in which the defendant might in-

voke the equal protection clause of the 14th Amendment. The list is too long to itemize." 1964 U.S.Code, Cong. & Admin.News p. 2478.